## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **DANNY E. MARTINEZ,** | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. C-10-104** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY,** | § | |
| **Defendant** | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Danny E. Martinez filed a complaint seeking reversal of the decision of the

defendant Commissioner of Social Security ("Commissioner") for the purpose of

receiving Supplemental Security Income ("SSI").  Proceeding *pro se*, plaintiff filed a

motion for summary judgment on August 6, 2010 and an amended motion for summary

judgment on August 12, 2010 (D.E. 9, 12).  Defendant filed a cross-motion for summary

judgment on August 20, 2010 (D.E. 13).  Plaintiff supplemented the summary judgment

record and filed a response to defendant's cross-motion on September 7, 2010 (D.E. 16,

17).

## BACKGROUND

Plaintiff filed his application on May 31, 2007 and it was denied at all

administrative levels (Tr. 43-48, 50-53, 9-22, 1-3).  Plaintiff alleges an inability to work

because of a rotator cuff tear and also leg and knee pain (Tr. 41, 42).  His reported

symptoms include pain in his right hip and leg and in his back, weakness in his right leg,

numbness in his left hand, limited overhead reaching with his left arm and fatigue (Tr. 139-141).  Prior to the onset of his disability, plaintiff did automobile paint and body work (Tr. 108).

## MEDICAL EVIDENCE

On November 15, 2002 plaintiff suffered a fractured right femur following an accident in which he was riding a motorcycle and was cut off by a car.  He sustained a comminuted right mid-shaft fracture of his right femur (Tr. 366).  On November 18, 2002 Dr. Edward Sheffield performed a closed reduction and insertion of an intramedullary rod to plaintiff's right femur (Tr. 364-365).

On June 23, 2003 plaintiff saw Robert Lewis, M.D., an orthopaedic surgeon.  Physical examination showed that plaintiff's right leg was one inch shorter than his left leg.  Plaintiff also had some mid-thigh tenderness to palpation as well as some pain in the anterior aspect of his right knee.  He otherwise had good range of motion of the hip and knee on the involved side.  X-rays showed a retrograde interlocking type IM rod in the right femur.  There was some callus formation posteriorly with a radiolucent line through the anterior cortex of the femur and he had some generalized atrophy of the thigh.  Dr. Lewis recommended physical therapy and a shoe lift on plaintiff's right side (Tr. 305-307).

On July 25, 2003 Dr. Lewis noted that plaintiff had residual pain in his mid-thigh region but believed the physical therapy was effective.  Dr. Lewis recommended a CT scan to rule out a non-union and prescribed Vioxx for pain and inflammation (Tr. 304).

2

The CT scan showed a partial non-union bridging bone on the medial side but minimal bone on the lateral side.  With the internal fixation Dr. Lewis believed plaintiff had a stable situation which should lead to fracture union.  Plaintiff also complained about right knee pain and Dr. Lewis recommended an MRI of his knee, which showed no evidence of ligament or meniscal pathology (Tr. 303).

Plaintiff continued to complain of pain just above his knee and had point tenderness over the screws which were used to interlock the nail.  On November 21, 2003 Dr. Lewis scheduled plaintiff for out-patient surgery to remove the interlocking screws (Tr. 301).  An attempt was made to remove the screws, but due to the soft nature of the titanium screw it could not be removed in the conventional fashion and the procedure was terminated (Tr. 300).  On December 16, 2003 plaintiff underwent a procedure to remove the intramedullary rod and interlocking screws on his right leg (Tr. 208).

On January 5, 2004 plaintiff was able to put full weight on his leg and Dr. Lewis believed that he could advance his activity (Tr. 295).  On January 19, 2004 plaintiff was using a cane for balance but reported minimal pain.  He had much better range of motion in his knee, but he had some weakness in his steps and needed to work on quadricep strengthening (Tr. 294).

In June 2004 plaintiff reported having difficulty obtaining employment because of residual problems in his right leg.  He presented with slight knee pain and had some patellar crepitus with activity-related swelling.  Dr. Lewis noted that plaintiff's right leg was 2.25 inches shorter than his left leg and recommended a shoe lift as well as a patellar

3

stablilizer brace for his knee.  Dr. Lewis noted that he would not recommend any repetitive kneeling or stooping and that plaintiff should avoid climbing.  In addition, lifting more than 25-30 pounds would aggravate plaintiff's lower extremity problems (Tr. 292).  The record indicates that plaintiff returned to work in 2004 and continued to work through at least part of 2006 (Tr. 97).

Plaintiff next saw Dr. Lewis on November 10, 2006, complaining of left shoulder pain which had recently intensified.  He had a very limited range of motion in the shoulder secondary to pain and there was point tenderness along the AC joint and also the anterior and lateral acromion.  His rotator cuff was difficult to assess due to pain and limited motion.  X-rays showed some narrowing of the AC joint and an MRI scan showed tendinitis of the supraspinatus tendon but no tear.  There was also involvement of the biceps tendon and he had some early degenerative changes.  Dr. Lewis injected plaintiff's shoulder with Xylocaine and Aristospan and encouraged plaintiff to limit activities for the next few days and then try to increase his overall function (Tr. 173).  Plaintiff returned to Dr. Lewis on November 22, 2006 reporting that he continued to have problems with his left shoulder.  Plaintiff was reluctant to allow any range of motion in his shoulder and had a repetitive popping sensation with rotation (Tr. 172).

On December 12, 2006 plaintiff underwent arthroscopy of his left shoulder with a subacromial decompression and acromioplasty and also an open rotator cuff and subscapularis muscle repair (Tr. 181).  Plaintiff began physical therapy on January 2, 2007.  As of February 21, 2007 plaintiff had 165 degrees of flexion in both his right and

4

left shoulder; 165 degrees of abduction in his right, but only 95 in his left; 90 degrees of

internal rotation on the right and 65 on the left and 90 degrees of external rotation on the

right and 70 on the left.  It was noted that plaintiff had worked very hard in therapy and at

home with his exercise program.  He continued to make progress with his range of

motion, strength and functional use of his shoulder (Tr. 184).  In May 2007 plaintiff

reported that he was doing exercises at home for his shoulder.  He had some crepitus with

range of motion, pain in the overhead position and limited strength (Tr. 167).

On July 13, 2007 plaintiff complained of pain in his left shoulder making it

difficult for him to regain any functional use.  He had palpable crepitus with rotation and

difficulty moving his hand to an overhead position (Tr. 166).  On September 7, 2007

plaintiff reported continued pain in his left shoulder and a popping sensation when he

tried to externally rotate the arm with his elbow by his side.  Dr. Lewis opined that he

most likely had some scar tissue and/or sutures that were symptomatic and discussed the

possibility of cortisone injections which plaintiff declined.  In addition, plaintiff

complained of chronic pain in his left hip in the posterior aspect with some giving way in

his knee (Tr. 165).

On August 12, 2007 plaintiff underwent an internal medicine consultation at the

request of Disability Determination Services.  Plaintiff told Rene Rodriguez, M.D., that

he had constant, throbbing pain in his right hip and knee and that he was unable to kneel.

The pain was aggravated by standing or walking and he had to use a cane to ambulate.

Plaintiff also wore a brace on his right knee to stabilize it (Tr. 276).

Plaintiff also complained of pain and loss of range of motion in his left shoulder since a motor vehicle accident in September 2006. He had numbness from his shoulder down to his elbow but felt that his entire arm and hand were weak. He was taking Darvocet and Lortab for pain (Tr. 267).

On examination plaintiff had tenderness to his right shoulder on palpation. Range of motion in the shoulder was 100 degrees on anterior extension, 92 degrees on lateral extension and 50 degrees on posterior extension. The empty can sign was positive and the scratch sign was painful. During the procedure plaintiff had popping sounds in his shoulder (Tr. 268). His neurological exam was normal (Tr. 268).

X-rays of plaintiff's shoulder showed postsurgical changes in the humeral and soft tissue calcification adjacent to the humeral head. X-rays of his lumbar spine showed evidence of old trauma at L2, minimal loss of height and a slightly narrowed L1-L2 interspace. Dr. Rodriguez's impression was calcific tendinitis and bursitis of the left shoulder status post surgery and status post fracture of the right femur. Dr. Rodriguez commented that plaintiff was able to sit, stand and move about and could lift, carry and handle small objects. He had a mild to moderate degree of pain at 5-6/10. He could not walk on his heels or toes, squat, hop or do tandem walking because of pain in his right femur and knee areas. He used a cane to ambulate to keep his right knee stable (Tr. 269).

On November 30, 2007 plaintiff complained of pain in his left shoulder, lower back, right hip and knee. On clinical examination he had a popping sensation with rotation of his shoulder. Dr. Lewis noted that because plaintiff did not have insurance,

further diagnostic studies would be extremely expensive (Tr. 329).  In January 2008 plaintiff complained of continued pain in his left shoulder as well as his right hip and leg extending down to his knee.  He wore a knee brace but complained of persistent swelling with activity.  He had crepitus with movement and pain over the AC joint.  He also had referred pain to the scapula region as well as the base of his neck.  He was taking two to three Lortab 7.5 mg. for pain (Tr. 328).

On December 6, 2007 Dr. Lewis completed a medical opinion form regarding plaintiff's ability to do work-related activities, diagnosing plaintiff with left shoulder, right hip and right knee pain.  His prognosis was poor.  Dr. Lewis could not cite to clinical findings to support plaintiff's musculoskeletal complaints because plaintiff did not have insurance and could not afford diagnostic tests.  Dr. Lewis did not believe plaintiff was a malingerer and he was compliant with his treatment.  When asked about drug side effects, the doctor noted that the Hydrocodone plaintiff took for pain provided minimal benefit and caused a prolonged sleep pattern (Tr. 314).

Plaintiff used a cane to walk and required a wheelchair for walking extended distances.  Dr. Lewis thought plaintiff could lift and carry less than 10 pounds, sit, stand and walk for less than two hours per day and would need to be able to sit and stand at will throughout the day.  When sitting he would need to have his leg elevated 12 to 18 inches but for less than one hour at a time.  He would need to avoid crouching, climbing stairs and ladders, reaching overhead, handling, feeling, pushing and pulling.  Dr. Lewis did not think plaintiff could return to his previous employment (Tr. 315).

7

Plaintiff underwent a mental health assessment on December 21, 2007.  He reported feeling stressed because he could not do the things that he was used to doing and did not like depending on other people to do things for him.  His wife reported that he sometimes called her when she was at work and said he wanted to kill himself (Tr. 318).  He was diagnosed with an adjustment disorder with a depressed mood and given a GAF of 58.[1]

In March 2008 Dr. Lewis completed another medical opinion form, where he again diagnosed plaintiff with left shoulder pain and chronic hip and leg pain extending down to his knee on the right side.  When asked what clinical findings supported his diagnosis, Dr. Lewis stated that plaintiff needed further diagnostic testing but was unable to afford to have the tests done.  Overall, his 2008 assessment mirrored his 2007 assessment, with the exception that Dr. Lewis did not think plaintiff could work at all because of his overall medical condition (Tr. 331-332).

Plaintiff saw Dr. Lewis in May and July 2008, still complaining of chronic left shoulder pain as well as hip and knee pain.  He had palpable crepitus with rotation of his shoulder and difficulty in the overhead position.  He was taking Lortab several times per day (Tr. 351).

---

[1]The Global Assessment of Functioning ("GAF") Scale takes into account psychological, social and occupational functioning on a hypothetical continuum of mental health--illness.  A GAF of 51-60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  Diagnostic and Statistical Manual of Mental Disorders ("DSM") Fourth Ed. (1994), p. 34.

Dr. Lewis completed a third medical opinion form on October 22, 2009 where he noted that due to chronic, significant, persistent, severe pain, swelling and inflammation, plaintiff continues to have multiple problems related to his left shoulder, right knee and hip area which causes much difficulty standing or sitting for any length of time and also causes restricted function of the left shoulder with a high probability of nerve, muscle or tendon damage.  He was a candidate for further surgery on his rotator cuff.  His prognosis despite treatment was poor and deteriorating (Tr. 407-408).  He had pain and crepitus on a daily basis when trying to rotate his left shoulder and had very limited overhead use.  In addition he had intermittent paresthesias in his left shoulder extending to his arm.  He also had severe diffuse right knee pain and constant, severe pain in his lower back and right hip area with gait difficulty.  In addition, he had shortness of breath and problems sleeping.

He used a cane, walker and wheelchair for walking extended distances.  He also required a knee brace for weight-bearing and support.  Dr. Lewis noted the same weight, sitting, standing and postural limitations he had on the previous forms.  In addition, Dr. Lewis stated that plaintiff was unable to use his left arm for any physical activity (Tr. 408-409).

## HEARING TESTIMONY

At the hearing held on January 6, 2009, plaintiff, represented by counsel, testified that he was 42 years old, five feet, four inches tall and weighed 126 pounds.  He was left-

handed and had completed the twelfth grade.  He was married.  He had always done automotive paint and body work, where he routinely lifted up to 50 pounds (Tr. 26-28).

He had last worked in October 2006, when he was involved in an automobile accident and injured his left shoulder.  He had also been in a motorcycle accident in 2003 where he injured his right knee, which continued to give him problems (Tr. 28-29).

He is unable to lift a gallon of milk with his left arm and has problems holding onto a cup of coffee or a glass.  Everything he grabs needs to be plastic or styrofoam because he drops things.  He cannot lift his left arm above his shoulder (Tr. 29-30).  He uses a cane when he walks because his leg gives way and his doctors think it is a good idea for him to use one.  He had fallen the previous day while going to church (Tr. 30).  If he stands up too long his right knee swells.  He elevates it to keep the swelling down (Tr. 31).  His right hip hurts which doctors have attributed to his gait (Tr. 31).  He can sit for about an hour and a half before needing to stand up because his back and hip start hurting. He could stand for an hour at most, but after that he would need to sit down and rest for a while (Tr. 31-32).  He can walk about one block (Tr. 32).

He has trouble sleeping because he cannot put much weight on his left shoulder and if he sleeps on his right hip his right leg bothers him.  He tries to sleep on his stomach, but sometimes he has to get up and sleep in a chair (Tr. 30-31).  He usually sleeps three or four hours a night and is usually tired during the day (Tr. 31).  Because the medication he takes makes him drowsy, he prefers not to drive (Tr. 32-33).  He takes Hydrocodone N-500 every six hours for pain, and takes Advil in between to help his pain.

10

The medication brings the pain down, but it never completely goes away. The Hydrocodone makes him nauseous and drowsy (Tr. 33). He received some money from a retirement plan in 2007 (Tr. 34).

The medical expert ("ME") testified that there was not much evidence in the record regarding plaintiff's leg injury and surgery (Tr. 34-35). He then summarized the medical records which were present (Tr. 35). The ME concurred with the medical consultant's residual functional capacity ("RFC") assessment, finding that plaintiff could lift 20 pounds occasionally, 10 pounds frequently; stand, sit or walk six hours out of an eight-hour work day; engage in unlimited pushing, pulling, climbing ramps or stairs, balancing, stooping and crouching; occasionally kneel or crawl; never climb a ladder, rope or scaffold; engage only in limited overhead reaching with his left arm and do unlimited handling, fingering and feeling and that he had no visual, communicative or environmental limitations (Tr. 36-37, 271-278).

The ME acknowledged that plaintiff's right leg is 2.5 inches shorter than his left leg but said that with a shoe lift and a knee brace that the problems should not be insurmountable. He then noted that in a record from June 2004 it was said that lifting more than 25-30 pounds on a daily basis would aggravate his extremities (Tr. 37).

The vocational expert ("VE") testified that plaintiff's work doing auto body paint and repair was considered medium and skilled. The ALJ described a person who could frequently stand and walk with normal breaks, frequently climb ladders and ropes but never scaffolds, and occasionally kneel, crawl and reach overhead with his left arm (Tr.

11

38).  The VE testified that such a person could not do plaintiff's past work, but could do light work such as that of an electronics worker which is a bench job where he could sit or stand.  Such jobs are light and unskilled with 3,000 in Texas and 283,000 in the national economy.  There are 4,800 electronic assembler jobs in Texas and more than 395,000 in the national economy (Tr. 38-39).  Plaintiff could also work as an optical goods bench worker which is light and unskilled with 2,800 in Texas and 210,000 in the national economy.  In addition he could be employed as a wire worker, which also is light and unskilled with 1,500 positions in Texas and 98,000 in the national economy.  He would be able to prop his leg up under the bench where he was working, but could not prop up to chest height.  If he needed to miss two working days a month he would not be employable (Tr. 39).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.;  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).  The burden has been described as more than a scintilla, but lower than a preponderance.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible

12

choices' or 'no contrary medical evidence.'" <u>Johnson v. Bowen</u>, 864 F.2d 340, 344 (5th Cir. 1988)(citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994)(citations omitted).  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors:  (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work.  <u>Martinez v. Chater</u>, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. <u>Bowling v. Shalala</u>, 36 F.3d 431, 435 (5th Cir. 1994).

# DISCUSSION

In the opinion issued on January 22, 2009, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 25, 2006. He further found that plaintiff had severe impairments, namely, a history of a left shoulder problem, right knee and hip pain and some depression but did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ next determined that plaintiff had the RFC to perform light work except for only occasional lifting overhead. The ALJ then found that plaintiff was unable to perform his past relevant work, but that other jobs exist in the national economy that he could perform. Accordingly, the ALJ found him not disabled (Tr. 12-22).

Plaintiff objects to these findings and argues that the ALJ erred (1) by disregarding the opinion of the treating physician; (2) by improperly discrediting plaintiff's testimony regarding his pain and abilities; (3) by failing to adequately develop the record and (4) by finding that plaintiff can do light work. Defendant counters that the ALJ opinion is supported by substantial evidence.

## A.  RFC and the Testimony of the Treating Physician

Plaintiff argues that the ALJ failed to properly credit the opinions of his treating physician regarding his RFC. Dr. Lewis assessed plaintiff as being able to lift and carry less than 10 pounds, being unable to sit, stand or walk for two hours without taking breaks and elevating his leg and being unable to do any reaching, handling, fingering, feeling, pushing or pulling (Tr. 332). Had the ALJ given Dr. Lewis's opinion controlling

14

weight, he would have found plaintiff able to do sedentary work with additional

limitations.[2]  Instead, the ALJ found that plaintiff can do light work except for only

occasional lifting overhead.[3]

Under the regulations, the Commissioner is supposed to give more weight to

opinions from treating sources because they are more likely to be the medical

professionals most able to provide a detailed, longitudinal picture of a plaintiff's

impairments and might bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations or brief hospitalizations.  If the treating

physician's opinion on the nature and severity of an impairment is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

---

[2]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. §404.1567 (a).

[3]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

with the other substantial evidence in the case record, the Commissioner is supposed to give it controlling weight.  If he does not give it controlling weight, he is supposed to look at the length, nature and extent of the treating relationship, the frequency of examination, the support provided by other evidence, the consistency of the opinion with the record as a whole and the specialization of the treating physician.  20 C.F.R. § 404.1527(d).

The ALJ can decrease reliance on treating physician testimony for good cause, which includes statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques or otherwise unsupported by evidence.  Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995)(citations omitted).  However, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating physician, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's view under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).  Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000)(emphasis in original).

In this case, the ALJ discounted Dr. Lewis's opinions regarding the limitations caused by plaintiff's impairments because there were no current diagnostic studies to support the doctor's conclusion that plaintiff could no longer work.  In addition, the ALJ found that although plaintiff used a cane and occasionally a wheel chair, there was no documentation that the assistive devices had been prescribed.  Also, there was evidence that plaintiff had good results from physical therapy early on and no evidence that he had

been prescribed more therapy.  In addition, his follow-up treatment has remained routine in nature and plaintiff had not required any hospitalizations or extensive treatment, but only Lortab for pain and a muscle relaxant (Tr. 20).

While the ALJ is correct that there is no record of a doctor prescribing a cane for plaintiff, both Dr. Lewis and Dr. Rodriguez noted several times that plaintiff needed a cane to walk or stand (Tr. 315, 331, 409, 267, 269).  It is possible that plaintiff obtained a cane without a prescription, but nothing in the record indicates that he did not actually need to use a cane to walk.  To the contrary, the fact that he needed to use a cane was accepted without question by the doctors who examined and treated plaintiff.

Regarding the fact that there are no current diagnostic records to back up Dr. Lewis's assessment, the doctor commented repeatedly that because plaintiff did not have insurance, he could not afford to have any diagnostic tests performed (Tr. 314, 329, 331). In addition, the ALJ discredited Dr. Lewis's assessment because plaintiff had not received substantial follow-up treatment, but Dr. Lewis commented on October 22, 2009 that there was a high probability that plaintiff had nerve, muscle or tendon damage and was a candidate for further surgery on his rotator cuff (Tr. 408).  The ALJ did not address the fact that plaintiff has not been able to afford diagnostic testing or further treatment.  His failure to do so renders meaningless his reliance on the lack of diagnostic testing or further treatment to discount Dr. Lewis's opinion regarding the severity of plaintiff's impairments.

17

Moreover, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion based on personal examination or treatment of the claimant, the ALJ *must* seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)(emphasis in original).  Because the ALJ in this case found that the records were insufficient to give Dr. Lewis's opinion controlling weight, he should have contacted the doctor for clarification or additional evidence.

In addition, the ALJ has the discretion to order that a claimant receive a consultative examination and can also order diagnostic tests and procedures.  20 C.F.R. 404.1519, 404.1519k, 404.1519m.  Indeed, a consultative examination at government expense may be required if the record establishes that such an examination is *necessary* to enable the ALJ to make the disability decision.  Haywood v. Sullivan, 888 F.2d 1463, 1472 (5th Cir. 1989)(citing Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1997)(per curiam)(emphasis in original).  The decision to require such an examination is discretionary, but discretion is limited when the claimant raises the requisite suspicion that such an examination is necessary for the ALJ to discharge his duty of full inquiry. Haywood, Id. (citing Jones v. Bowen, 829 F.2d 524, 526 (5th Cir. 1987)(per curiam)).

In this case, plaintiff has raised a suspicion that he is suffering from more severe shoulder and leg impairments than can be detected by physical examination.  Dr. Lewis stated repeatedly that plaintiff needed further testing because he most likely has nerve, muscle or tendon damage and is a candidate for further surgery and the assessment is not

18

contradicted by anything in the record.  Therefore, based on the relevant regulations and case law, plaintiff's case should be remanded so that the treating physician's opinion can be properly considered and, if warranted, additional testing can be ordered at government expense to properly determine the extent of plaintiff's impairments.

Because the ALJ's decision to discredit Dr. Lewis's opinion about plaintiff's limitations is not based on substantial evidence, his determination that plaintiff can do light work also is not supported by substantial evidence.  Plaintiff's RFC to do work should be reassessed on remand.

### B. Plaintiff's Testimony

Plaintiff further argues that the ALJ improperly discredited his testimony regarding his pain and other limitations.  Social Security Ruling ("SSR") 96-7P[4] addresses evaluation of symptoms in disability claims and in particular, the credibility of an individual's statements.  According to the ruling, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms.  The ALJ must next evaluate the intensity, persistence and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's abilities to do basic work activities.  If the individual's statements regarding the intensity,

---

[4]Social Security Rulings are not binding on the court, but may be consulted when the statute at issue provides little guidance.  The Fifth Circuit has frequently relied upon the rulings in evaluating ALJ decisions.  Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(citations omitted).

persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider the entire case record, including medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians, psychologists or other persons about the symptoms and how they affect the individual and any other relevant evidence.

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence, SSR 96-7P sets out the following factors, outlined in 20 C.F.R. 404.1529(c) and 416.929(c), which the ALJ should consider: (1) the individual's daily activities;  (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms;  (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms, such as lying flat, standing for 15 to 20 minutes every hour or sleeping on a board; (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Finally, the Ruling sets for the standard for making credibility determinations:

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96-7P, 1996 WL 374186 at *4 (S.S.A.).

In this case the ALJ gave the same reasons for discounting plaintiff's testimony regarding his pain and limitations as he did for discounting the treating physician's testimony–that no physician has prescribed a cane or wheelchair, that there are no current diagnostic studies to support plaintiff's allegations and that his follow-up treatment has been routine in nature (Tr. 20). As discussed above, it is undisputed that the reason plaintiff has not had further diagnostic testing or additional procedures is that he cannot afford to have them done. Also, although there is no prescription for an assistive walking device in the record, it is undisputed that he needs to walk with a cane to maintain his balance.

The ALJ's reasons for discounting plaintiff's testimony are not supported by the evidence of record. Accordingly, it is recommended that plaintiff's case be remanded and

that following an orthopaedic consultative examination and/or additional testing as needed, that plaintiff's subjective complaints be reevaluated.

### C.  Development of the Record

Plaintiff argues that the ALJ failed to fully and fairly develop the facts relative to his claim for benefits.  In <u>Newton</u> the Fifth Circuit discussed the ALJ's duty to obtain supplemental information when faced with a record he deems to be incomplete, citing the Second Circuit.  "'[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" <u>Newton</u>, 209 F.3d at 457 (citing <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999)).  "'[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.'" <u>Id.</u>, 209 at 457-458 (citing <u>Schaal v. Apfel</u>, 134 F.3d 496, 505 (2d Cir. 1998)).  If the ALJ has not fully developed the record, the case may be reversed upon a showing of prejudice by the plaintiff.  "'Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.'" <u>Id.</u> at 458 (citing <u>Ripley v. Chater</u> 67 F.3d 552, 557, n. 22 (5th Cir. 1995)).  In this case if the ALJ had contacted Dr. Lewis, it is likely that the doctor would have been able to describe his examinations of plaintiff in more detail, and could have given his opinion about plaintiff's underlying orthopaedic problems and described needed diagnostic testing. There is a good possibility that the evidence would have supported Dr. Lewis's assessment of plaintiff's limitations as well as provided a basis for plaintiff's subjective complaints of pain and

22

limitations of abilities.  Accordingly, as discussed above, it is recommended that plaintiff's case be remanded for additional development of the record.

## RECOMMENDATION

Based on the foregoing, it is respectfully recommended that plaintiff's amended motion for summary judgment (D.E. 12) be granted and that the defendant's cross-motion for summary judgment (D.E. 13) be denied.  The Commissioner's determination that plaintiff is not disabled is not supported by substantial evidence and should be vacated.  It is further recommended that plaintiff's case be remanded to the Social Security Administration so that a proper assessment can be made of the treating physician's opinion and also so that, if warranted, plaintiff can undergo additional diagnostic testing in accordance with 20 C.F.R. 404.1519, 404.1519k and 404.1519m.  This recommendation for remand is made pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Respectfully submitted this 28th day of October, 2010.

_____

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** of receipt of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)-(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  <u>Douglass v. United Servs. Auto Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996)(en banc).